**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

UNITED STATES OF AMERICA

v.                                        Criminal No. 3:10CR248

ADLEY H. ABDULWAHAB

**MEMORANDUM OPINION**

Adley H. Abdulwahab, a federal inmate proceeding by counsel, submitted this motion under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence ("§ 2255 Motion," ECF No. 490). Abdulwahab contends that he experienced ineffective assistance of counsel[1] in conjunction with his trial. Specifically, Abdulwahab demands relief because:[2]

| | |
|---|---|
| Claim One: | "Counsel stipulated and failed to object to inadmissible evidence of petitioner's prior criminal history." (§ 2255 Mot. 13.) |
| Claim Two: | "Counsel failed to object to evidence of petitioner's lavish personal spending and the prosecutor's appeal to class prejudice." (Id. at 17.) |
| Claim Three: | "Counsel failed to object to petitioner's use of an alias." (Id. at 20.) |
| Claim Four: | "Counsel failed to object to the visible restraint of petitioner in the presence of the jury." (Id. at 21.) |

_____

[1] "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI.

[2] The Court omits the emphasis in the quotations from Abdulwahab's submissions.

The Government has responded, asserting that Abdulwahab's claims lack merit. (ECF No. 506.) Abdulwahab has filed a Reply. (ECF No. 513.) For the reasons set forth below, Abdulwahab's § 2255 Motion (ECF No. 490) will be denied.

## I. PROCEDURAL HISTORY

On September 7, 2010, a grand jury charged Abdulwahab with one count of mail fraud conspiracy (Count One); six counts of mail fraud (Counts Two through Seven); one count of conspiracy to commit money laundering (Count Eight); six counts of money laundering (Counts Nine through Fourteen); and four counts of securities fraud (Counts Fifteen through Eighteen). (Indictment 1-29, ECF No. 3.) On February 1, 2011, the grand jury returned a Superseding Indictment charging the same counts. (Superseding Indictment 1-29, ECF No. 140.) By Memorandum Opinion and Order entered on March 7, 2011, the Court granted Abdulwahab's and co-defendant Christian Allmendinger's separate motions to sever their trials. United States v. Allmendinger, Nos. 3:10CR248-01, 3:10CR248-02, 2011 WL 841514, at *1 (E.D. Va. Mar. 7, 2011); (see ECF Nos. 177-78).

On May 31, 2011, the Government filed a Motion to Dismiss Counts Four, Ten, and Sixteen of the Superseding Indictment with respect to Abdulwahab. (ECF No. 248.) By Order entered on June

2

3, 2011, the Court granted the Government's motion. (ECF No. 254.)

On June 3, 2011, the jury trial commenced. After the Government rested, Abdulwahab moved for a judgment of acquittal as to all counts pursuant to Federal Rule of Criminal Procedure 29. (June 9, 2011 Tr. 646-58, ECF No. 295.) The Court denied the motion. (June 9, 2011 Tr. 659.)[3] Abdulwahab provided the sole testimony for his defense. (June 9, 2011 Tr. 683-812.) Subsequently, Abdulwahab renewed his motion for a judgment of acquittal, which the Court denied. (June 10, 2011 Tr. 3-8, ECF No. 286.) After less than a day of deliberations, the jury returned its verdict, finding Abdulwahab guilty of the remaining fourteen counts of the Superseding Indictment. (ECF No. 262.)

On November 9, 2011, the Court entered judgment against Abdulwahab and sentenced him to 720 months of imprisonment. (J. 3, ECF No. 386.) Abdulwahab appealed. The United States Court of Appeals for the Fourth Circuit reversed Abdulwahab's

---

[3] In denying the motion for acquittal, however, the Court stated:

> I find that if you look—I don't like the money laundering because I just think it clutters up all cases that it's brought into. It's unduly complicated, fouled up, and it double counts the use of the evidence, the fact is under the law in the circuit and the Supreme Court, there's sufficient evidence to support a money-laundering charge.

(June 9, 2011 Tr. 659.)

convictions for money laundering, but affirmed the remainder of his convictions. United States v. Abdulwahab, 715 F.3d 521, 523 (4th Cir. 2013).   The Fourth Circuit vacated Abdulwahab's sentence and remanded the matter for resentencing.   Id.   On September 6, 2013, the Court entered an amended judgment against Abdulwahab and again sentenced him to 720 months of imprisonment.   (Am. J. 3, ECF No. 472.)   Abdulwahab filed no further appeal.

## II.   SUMMARY OF EVIDENCE

The Fourth Circuit summarized the evidence of Abdulwahab's guilt as follows:

> Christian M. Allmendinger and Brent Oncale founded a company known as "A & O" in Houston, Texas, in late 2004.   The company sold life settlement investments, which are interests in life insurance policies.   Until the end of 2006, A & O sold "bonded life settlements," which were interests in particular life insurance policies.   The investments were for fixed terms of between four and seven years.   If the insured died during the term, the life insurance company would pay a benefit, but if the insured remained alive, a reinsurance bond, which A & O purchased from Provident Capital Indemnity ("PCI"), was designed to pay out and take over the life insurance policy (so long as the life insurance policy premiums were current).
> Allmendinger and Oncale marketed and sold A & O's bonded life settlements directly to investors, and in early 2005, they hired Abdulwahab to market and sell their products.   At the time, Abdulwahab was selling a different product for a different company, BHC Marketing.   BHC soon terminated Abdulwahab, however, and he began working full-time as A & O's "national accounts director."   Abdulwahab owned and operated

4

Houston Investment Center ("HIC"), a Texas company that served as A & O's marketing arm. Through HIC, Abdulwahab employed mid-level sales managers who, in turn, supervised independent A & O sales agents around the country. A & O paid HIC its first commission on May 26, 2005.

In marketing A & O's products, both orally and through written materials they created, Allmendinger, Oncale, and Abdulwahab lied about many critical facts. For example, they represented that investor funds were placed in a segregated account dedicated to those payments and used right away to pay policy premiums up front. In reality, A & O had no separate account to pay premiums and A & O paid the premiums only as they became due. Indeed, A & O commingled investor money in a general operating account that A & O used for paying its bills.[4] While A & O was operating, Allmendinger, Oncale, and Abdulwahab misappropriated millions of dollars from this account for their personal benefit.

The coconspirators also misrepresented A & O's size, staff, and record of earning returns for its investors. In 2005 and 2006, A & O's websites listed fictional people as company principals, falsely stated that A & O had offices in multiple states, greatly exaggerated the number of A & O employees, and falsely stated that A & O had particular legal and business professionals on its staff. The sites also stated in July 2005 that A & O had "enabled [its] clients to leverage $375 million into $800 million in less than five years," when in actuality, no investor had received any pay out at that time and Abdulwahab had been informed of that fact. Abdulwahab assisted in creating the 2006 version of the website, and his business card listed the website address.

In 2006, Allmendinger and Oncale invited Abdulwahab, who was, at that point, responsible for 80-90% of A & O's sales, to become a partner. Thereafter, the three men each held an equal interest in A & O and shared authority over the company. Abdulwahab also was added as a signatory to A & O's bank accounts. HIC continued to market A & O's

---

[4] The payment of premiums was no small concern because, without such payment, policies would lapse, rendering the associated investments worthless.

5

products, and A & O's commission payments to HIC remained unchanged.

By late 2006, regulators from different states began to send inquiries to A & O regarding its life settlement product, based largely on concerns that A & O was selling an unregistered security. These inquiries prompted the three partners to consult with Florida attorney Michael Lapat, who assisted A & O in setting up hedge funds that were backed by life settlements. By early 2007, A & O began offering fractionalized interests in these funds that they called "capital appreciation bonds."

The three partners agreed that Abdulwahab would serve as fund manager. In the course of drafting the necessary offering documents and disclosures, Lapat used information from a document that Abdulwahab had completed earlier in 2006 in connection with an unrelated hedge fund ("the 2006 document"). Abdulwahab had falsely represented on that document that he had earned an economics degree from Louisiana State University when he had neither attended LSU nor obtained a college degree from any school. Abdulwahab had checked "no" in response to the question of whether he had "been convicted or pled guilty or nolo contendere, no contest . . . to a felony or misdemeanor involving investments or investment-related business, fraud, false statements or omissions, wrongful taking of property, bribery, forgery, counterfeiting or extortion." . . . He also had checked "no" in response to the question of whether "[he] or an organization of which [he] exercised management or policy control [had] ever been charged with any felony or charged with a misdemeanor" of the type described in the previous question. In actuality, Abdulwahab had pled guilty in 2004 in Harris County, Texas, to the felony of forgery of a commercial instrument. The court that accepted Abdulwahab's guilty plea deferred a final adjudication in his case and placed him on a five-year period of community supervision. Indeed, Abdulwahab was serving that term when he completed the 2006 document.[5]

Lapat used the 2006 document to draft a biography and the A & O funds' disclosure documents, including

_____

[5] On June 4, 2007, the court terminated Abdulwahab's period of supervision early and dismissed the case.

6

the private offering memorandum ("POM"). In so doing, Lapat discussed particular language with Abdulwahab. Because the POM was based on the 2006 document, the POM stated that Abdulwahab had earned his degree from LSU and did not disclose his felony plea. Although A & O regularly paid commissions of more than 10% to its sales agents, the POM nonetheless stated that A & O would invest 95% of investor funds in accordance with its investment objectives.

After making the change to selling capital appreciation bonds, A & O continued to operate in much the same way that it had previously, including using HIC to sell the bounds. A & O also continued to perpetrate various misrepresentations by creating new marketing materials. For example, the three principals and co-conspirator Eric Kunz drafted a "History Sheet" for A & O stating again that Abdulwahab had earned his economics degree from LSU, and A & O mailed this document daily in 2007 to sales agents and investors. In fact, A & O regularly utilized the mail to send marketing materials and investor documents.

As things turned out, A & O's decision to sell capital appreciation bonds instead of life settlements did not stem the tide of regulator inquiries. For this reason and because of some tension among the partners, Allmendinger, Oncale, and Abdulwahab agreed to sell A & O to a company called "Blue Dymond." Before the sale, however, Allmendinger, Oncale, and Abdulwahab helped themselves—for what Allmendinger believed was one final time—to several hundred thousand dollars from A & O's operating fund. After this raid on A & O's coffers, only $2.9 million remained in A & O's bank accounts—not even half of the amount A & O needed to pay the premiums on all of its policies up through their bonding dates.

Abdulwahab was retained as a consultant for six months after the sale as part of the sales contract. However, although Allmendinger did not know it, Abdulwahab and Oncale had constructed an elaborate secret plan to purchase the company themselves and continue running it. Blue Dymond—the buyer of A & O— was little more than a front for Abdulwahab and Oncale; it was an offshore shell company created and funded by Abdulwahab and Oncale with the assistance of

7

attorney Russell Mackert and without the knowledge of Allmendinger.

To fund the "sale," Oncale and Allmendinger each deposited $380,000 from their personal A & O disbursements into Mackert's attorney trust account. Under the terms of the sale, the partners were to receive $750,000, with the expectation of an additional $250,000 in the 18 months following the sale.  While Allmendinger received his $750,000 check, Oncale and Abdulwahab—unbeknownst to Allmendinger, each received checks in the amount of only $750 and secretly continued the business through Blue Dymond. Mackert wrote all three of these checks from his attorney trust account.

In September 2007, Mackert, at the direction of Abdulwahab and Oncale, also formed another offshore shell company, Physicians Trust, LLC, in the Caribbean Island of Nevis.  This new company allegedly purchased Blue Dymond in order to further disguise Abdulwahab's and Oncale's involvement with A & O.  That same month, Abdulwahab and Oncale hired David White to serve as A & O's president.

Through August 31, 2007, the date of the sale, Allmendinger had personally received $8,455,033.60 from A & O; Oncale had received $7,303,496.98; and Abdulwahab had received $2,889,366.70.   With Allmendinger gone, A & O continued generally to operate in much the same manner as it had before. However, the remaining principals accelerated their misappropriation of investor funds.  Indeed, after the sham sale, Abdulwahab and Oncale transferred approximately $10 million of investor funds from A & O's bank accounts to Mackert's attorney trust account, about $5.1 million of which was for Abdulwahab's benefit.

All told, A & O signed 843 investor contracts investing a total of $104,048,660.18 between 2004 and 2008.   During that period, Abdulwahab personally received $8,002,904.78 from the scheme.

Mackert took over the management of the A & O entities in March 2008.  A & O had stopped taking new investor funds by that time, and Mackert's role was essentially to make sure that premiums were paid, investor questions were answered, and investor files and policy files were protected.  The policy premiums were to be paid in part from $4.6 million that White

had paid to Prestige Escrow Company.  In March 2009, however, Mackert discovered that Prestige had stolen a large portion of that money.  In the next two months, Mackert undertook to determine how much money would be needed to continue to pay the policy premiums.  He concluded not only that there was not enough money after the theft but also that, even had the theft not occurred, the $4.6 million "wasn't even close" to being sufficient to pay the policy premiums.  With A & O lacking sufficient funds to make premium payments, Mackert subsequently placed A & O into bankruptcy.

United States v. Abdulwahab, 715 F.3d 521, 523-26 (4th Cir. 2013) (omission and second, third, fourth, and fifth alterations in original) (internal citations omitted).

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

To demonstrate ineffective assistance of counsel, a convicted defendant must show first, that counsel's representation was deficient and second, that the deficient performance prejudiced the defense.  Strickland v. Washington, 466 U.S. 668, 687 (1984).  To satisfy the deficient performance prong of Strickland, the convicted defendant must overcome the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" Burch v. Corcoran, 273 F.3d 577, 588 (4th Cir. 2001) (quoting Strickland, 466 U.S. at 689).  The prejudice component requires a convicted defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the

result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. In analyzing ineffective assistance of counsel claims, it is not necessary to determine whether counsel performed deficiently if the claim is readily dismissed for lack of prejudice. Id. at 697.

### A.   Claim One—Failure To Object To Evidence Of Prior Criminal History

In Claim One, Abdulwahab contends that counsel "stipulated and failed to object to inadmissible evidence of petitioner's prior criminal history." (§ 2255 Mot. 13.) Prior to trial, the parties filed the following stipulation with the Court:

> On or about April 23, 2004, Defendant Adley H. Abdulwahab pleaded guilty in the 337th District Court of Harris County, Texas, to Forgery of a Commercial Instrument, a felony. The court deferred final adjudication of Defendant Abdulwahab's case, and placed him on a five-year period of community supervision. On June 4, 2007, the court terminated Defendant Abdulwahab's period of supervision early and dismissed the case.

(Stipulation #3, ECF No. 172.) The stipulation was read to the jury during trial. (June 8, 2011 Tr. 243-44.) Abdulwahab now claims that his "guilty plea to and deferred adjudication for the offense of forgery was not relevant to an issue other than character, was not necessary to prove an element of the charged

10

offense, and was unfairly prejudicial pursuant to Rule 403" of the Federal Rules of Evidence because he had no legal duty to disclose such information. (§ 2255 Mot. 14, 16.)  This is simply untrue.

As to Abdulwahab's contention that his prior forgery conviction was not relevant, this Court has already held that "the fact of the Defendant's felony plea was relevant to the crimes alleged in the Superseding Indictment and was admissible pursuant to Federal Rule of Evidence 402." United States v. Abdulwahab, No. 3:10CR248-02, 2011 WL 4434236, at *5 (E.D. Va. Sept. 22, 2011), rev'd on other grounds by, 715 F.3d 521 (4th Cir. 2013).  Indeed, "[a]mong the manner and means of the mail fraud conspiracy alleged in Count One was the fact that the Defendant failed to disclose to certain investors that he had pled guilty to forgery of a commercial instrument in Texas in 2004." Id. (citing Superseding Indictment, at ¶ 64 (ECF No. 140)).[6]

Abdulwahab also argues that, absent a legal duty to disclose his prior conviction, he could not have been found

---

[6] Contrary to Abdulwahab's contention, the evidence during trial demonstrated that Abdulwahab previously failed to disclose this forgery conviction in a document he had completed in 2006 for an unrelated hedge fund. United States v. Abdulwahab, 715 F.3d 521, 524-25 (4th Cir. 2013).  Michael Lapat subsequently relied on the false representations in that document to establish hedge funds for A & O. Id. at 525.

guilty of fraudulently inducing individuals to invest in A & O. (§ 2255 Mot. 14-16.)   On direct appeal, Abdulwahab argued that he should have been acquitted of mail fraud because "he had no duty to disclose his criminal history to A & O's investors." Abdulwahab, 715 F.3d at 533.   The Fourth Circuit found that "the jury certainly could have rationally concluded that any suggestion by [Abdulwahab] that he was acting in good faith by omitting his felony plea was belied by his representation, on the 2006 document, that he had never even been charged with a felony."   Id. at 534.

The Fourth Circuit has recognized that, "at common law, no fiduciary relationship, no statute, no other independent legal duty to disclose is necessary to make active concealment actionable fraud—simple 'good faith' imposes an obligation not to purposefully conceal material facts with intent to deceive." United States v. Colton, 231 F.3d 890, 900 (4th Cir. 2000) (citations omitted).   Therefore, even though Abdulwahab had no legal duty to disclose his guilty plea, his failure to do so was a material non-disclosure intended to mislead A & O's investors. See Sonneberg v. United States, No. 01-2067, 2003 WL 1798982 (3d Cir. Apr. 4, 2003) (rejecting petitioner's claim that he could not be liable for mail and wire fraud because he had no legal duty to disclose a prior guilty plea and civil injunction).

12

Counsel cannot be faulted for failing to raise this meritless objection and instead stipulating to the prior conviction. See United States v. Moore, 934 F. Supp. 724, 731 (E.D. Va. 1996). Moreover, Abdulwahab has not demonstrated prejudice from counsel's failure to raise this objection, as "the evidence supporting Abdulwahab's various fraud convictions was strong and well beyond what was necessary to support his convictions." Abdulwahab, 715 F.3d at 534. Accordingly, Claim One will be dismissed because Abdulwahab fails to demonstrate deficiency or prejudice.

**B. Claim Two—Failure To Object To Evidence of Personal Spending**

In Claim Two, Abdulwahab alleges that counsel was ineffective for "fail[ing] to object to evidence of petitioner's lavish personal spending and the prosecutor's appeal to class prejudice." (§ 2255 Mot. 17.) According to Abdulwahab, counsel should have "file[d] a motion in limine and object[ed] to the evidence of petitioner's lavish lifestyle and personal expenditures." (Id. at 18.)

During the trial, the Government presented testimony from Special Agent John Norton of the Internal Revenue Service's criminal investigation division. (June 8, 2011 Tr. 499-500, ECF No. 294.) Special Agent Norton testified that he reviewed

13

expenditures from the HIC Wells Fargo account, for which
Abdulwahab was the signatory, for the time period from October
2005 through August 2007. (June 8, 2011 Tr. 513-14.) During
that time,

> [$]30,000 was paid to Bay State Motor Sports,
> $1,347.71 was paid to Gucci, $5,327.50 was paid to
> Macy's, $2,739.28 was paid for theme park tickets such
> as Magic Kingdom and Sea World, $56,825.83 was paid to
> Michael Klein's Fine Jewelry, $8,000 to Millennium
> Audi, $1,472.20 to Nordstrom, $13,322.80 to Prestige
> Time, LLC, $2,995 paid to Progressive Auto Sports,
> $1,545 to Watch Boutique, $3,166.31 to Zadok Jewelers,
> and $1,043,000 was transferred to [a] Bank of Jordan
> account in the name of Majda Abdulwahab.

(June 8, 2011 Tr. 514-15.) Special Agent Norton also testified
that he had reviewed records related to Abdulwahab's "purchases
of some vehicles." (June 8, 2011 Tr. 515.) On October 19,
2007, Abdulwahab purchased a BMW for $73,721.42. (June 8, 2011
Tr. 515-16.) Abdulwahab purchased a Jeep for $25,075.47 on
August 4, 2007. (June 8, 2011 Tr. 518.) Prior to the vehicle
purchases, Abdulwahab had received several deposits from A & O's
accounts, as well as attorney Russell Mackert's attorney trust
account, into his personal Wells Fargo bank accounts. (June 8,
2011 Tr. 516-18.) The vehicles were purchased with those
deposits. (June 8, 2011 Tr. 517-19.)

Abdulwahab first argues that this evidence was inadmissible
under Federal Rule of Evidence 401. (§ 2255 Mot. 18.) Rule 401

provides that "[e]vidence is relevant if: **(a)** it has any tendency to make a fact more or less probable than it would be without the evidence; and **(b)** the fact is of consequence in determining the action." Fed. R. Evid. 401. Here, the Superseding Indictment alleged that Abdulwahab and his co-conspirators misrepresented to investors that their money would be held in escrow for life settlement-related purposes. (Superseding Indictment ¶¶ 19, 21(e), 60.) The Superseding Indictment also alleged that the Private Offering Memorandum provided to investors stated that "95% of investor funds received by A & O would be invested in purchasing and maintaining a portfolio of life settlements." (Id. ¶ 31.) Accordingly, evidence of Abdulwahab's receipt of investor funds transferred from both A & O's business account and Mackert's attorney trust account, as well as evidence of his subsequent expenditures, was relevant as proof that Abdulwahab had made deliberate misrepresentations to investors concerning how their invested money would be used. And, it was relevant to prove his motive. Any objection by counsel suggesting that this evidence was inadmissible would have been meritless. See Moore, 934 F. Supp. at 731.

Abdulwahab also contends that this evidence was inadmissible under Rules 403 and 404(b) of the Federal Rules of

Evidence.  (§ 2255 Mot. 18.)   Rule 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following:  unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.   Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1).   However, such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accidence."   Fed. R. Evid. 404(b)(2).

In support of his argument, Abdulwahab cites to United States v. Hatfield, 685 F. Supp. 2d 320 (E.D.N.Y. 2010).   In Hatfield, the court considered whether evidence of the defendant's "'lavish' personal spending" was admissible to the question of "whether the stock trades and compensation methods [the defendant] used to acquire this money were legal."   Id. at 326.   The Hatfield court determined that to answer that question, it was "irrelevant if [the defendant] spent his

16

fortune on lavish parties, instead of donating it to starving Malawian orphans." Id. (citation omitted).

In the Fourth Circuit, however, evidence of lavish spending is "clearly probative of [the defendant's] motive (e.g., wealth accumulation and maintenance)." United States v. Cole, 631 F.3d 146, 155 (4th Cir. 2011); see also United States v. Shelburne, No. 2:06CR00023, 2008 WL 474094, at *2-3 (W.D. Va. Feb. 21, 2008 (collecting cases and finding that evidence of lavish spending could be admitted under Rules 403 and 404(b) "to demonstrate the defendant's motive-greed"). Here, the Government presented evidence of Abdulwahab's personal spending to demonstrate both his motive for diverting investor funds for his personal use and his intent to commit fraud by using investor funds for purposes other than those represented. Counsel is not deficient for failing to raise a meritless objection to this evidence. See Moore, 934 F. Supp. at 731.

Moreover, Abdulwahab cannot demonstrate prejudice from counsel's failure to object to the evidence of his lavish personal spending, because "the evidence supporting Abdulwahab's various fraud convictions was strong and well beyond what was necessary to support his convictions." Abdulwahab, 715 F.3d at 534. Claim Two will be dismissed.

### C.  Claim Three—Failure To Object To Use Of Alias

In Claim Three, Abdulwahab contends that counsel "failed to object to petitioner's use of an alias." (§ 2255 Mot. 20.) According to Abdulwahab, "[c]ounsel's failure to file a motion in limine and to object to the government's repeated references to petitioner's use of an alias constitutes deficient performance." (Id. at 21 (citation omitted).) During trial, various witnesses referred to Abdulwahab as "Adley Wahab." (See June 9, 2011 Tr. 683-84.) Abdulwahab testified that he would shorten his last name to Wahab because "Abdulwahab is difficult for people to say." (June 9, 2011 Tr. 684.)

During trial, the Government presented testimony from attorney Michael Lapat, president of Turn Key Hedge Funds. (June 7, 2011 Tr. 195, ECF No. 293.) In 2006, Abdulwahab contacted Lapat to create an unrelated hedge fund. (June 7, 2011 Tr. 197-98.) In the application, Abdulwahab represented that he had received a Bachelor's of Economics from Louisiana State University. (June 7, 2011 Tr. 199-200.) Abdulwahab also checked "no" in response to the question of whether he had ever been convicted of or pled guilty to a felony or misdemeanor "involving investments or investment-related business, fraud, false statements or omissions, wrongful taking of property, bribery, forgery, counterfeiting or extortion." (June 7, 2011

18

Tr. 202.)   Abdulwahab completed the application using the name "Adley Wahab."   (June 7, 2011 Tr. 204.)   Lapat subsequently used information from this application to draft the necessary documents and disclosures to set up the hedge funds for A & O. (June 7, 2011 Tr. 208-09.)[7]

Evidence of an alias is relevant when "the use of that alias is necessary to identify the defendant in connection with the acts charged in the indictment . . . ."  United States v. Clark, 541 F.2d 1016, 1018 (4th Cir. 1976) (citation omitted). Here, the Government's theory was that Abdulwahab made material misrepresentations to investors during the course of the fraud scheme.   Evidence that Abdulwahab was the same individual who, under the name Adley Wahab, misrepresented his education and criminal background on an application that ultimately was used to draft documents that were used to defraud individuals who invested in A & O's hedge funds, was relevant to explain the manner and means Abdulwahab used to carry out the scheme.  See United States v. Vogt, 910 F.2d 1184, 1192 (4th Cir. 1990) (admission of evidence card for the purpose of establishing defendant's use of alias to purchase certain asserts relevant to

_____

[7] As previously discussed, Abdulwahab's representations in this application were false, as Abdulwahab had "neither attended LSU nor obtained a college degree from any school," and he "had pled guilty in 2004 in Harris County, Texas, to the felony of forgery of a commercial instrument."  Abdulwahab, 715 F.3d at 524-25.

proof of the charges against him); see also United States v. Goode, No. 97-2163, 1999 WL 520553, at *3 (6th Cir. July 14, 1999) (evidence relating to alias relevant to establishing identity of a fingerprint found on glass used to cut cocaine and seized from defendant's residence); United States v. Brown, 5 F. Supp. 3d 786, 789 (E.D. Va. 2014) (evidence of defendant's alias relevant to tie him to "specific drug deals"). Abdulwahab fails to demonstrate that counsel was deficient for failing to make a meritless objection. See Moore, 934 F. Supp. at 731. Moreover, given that "the evidence supporting Abdulwahab's various fraud convictions was strong and well beyond what was necessary to support his convictions, Abdulwahab, 715 F.3d at 534, Abdulwahab cannot show any prejudice from counsel's failure to object to evidence of his alias. Accordingly, Claim Three will be dismissed.

**D.   Claim Four—Failure To Object To Visible Restraint Of Abdulwahab In Presence Of Jury**

In Claim Four, Abdulwahab alleges that counsel "failed to object to the visible restraint of petitioner in the presence of the jury." (§ 2255 Mot. 21.) On the second day of the trial,

> Abdulwahab was escorted into the courtroom from the Marshal's lockup after approximately six jury members had already been seated in the jury box . . . . In this particular case, the defendant concedes that he was not shackled or in handcuffs, and was dressed in civilian clothes. The Marshals escorted the defendant into the courtroom from the side entrance, with each

> Marshal having an arm on the defendant as a matter of restraint. Six jurors were already seated, and the remaining six were entering the courtroom from the jury room. Upon the observation by a Marshal that jury members were in the process of being seated, the Marshal immediately grabbed the defendant and pulled him back into the lockup area . . . .

(Mem. Supp Mot. for New Trial at 2, ECF No. 311.) Counsel did not raise an objection at that time. Rather, Abdulwahab filed a pro se motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. (ECF No. 272.) Counsel subsequently adopted that motion. (ECF Nos. 310 and 311.)

The Court denied the motion, stating:

> It is well-established that jurors' inadvertent sightings of a defendant's restraint are not per se prejudicial. United States v. Shaver, 511 F.2d 933, 935 (4th Cir. 1975); United States v. Rutledge, 40 F.3d 879, 883-84 (7th Cir. 1994), rev'd on other grounds, 517 U.S. 292 (1996) ("categorically reject[ing]" the argument "that prejudice automatically inheres in a trial when a juror inadvertently sees a defendant in handcuffs" and nothing that this position "is in accord with other circuits that have addressed this issue"); United States v. Williams, 809 F.2d 75, 84 (1st Cir. 1986) (collecting cases from the Second, Fifth, Sixth, Eighth, Tenth, and Eleventh Circuit Courts of Appeal for the same proposition). A new trial is warranted "only when the jury's view of the defendant in restraints is so inherently prejudicial that the right to a fair trial is denied." United States v. Momon, 1995 WL 231839, at *2 (4th Cir. 1995) (unpublished). "The defendant has the burden of showing that he was actually prejudiced when the jury had only a brief glimpse of him in restraints while being transported to and from the courtroom, as opposed to seeing him in restraints throughout the trial." Id. The fatal blow to the Defendant's claim that this warrants a new trial is the fact that he failed to raise this issue

21

at the time it occurred.  This failure prevented the
Court from polling the jury with regard to whether the
incident had rendered any jurors incapable of deciding
the case on the evidence.  Thus, the Defendant cannot
show any actual prejudice from any juror's inadvertent
glimpse of him being escorted in and out of the
courtroom.  Even if he had raised this at the time it
occurred, the extremely limited amount of "restraint"
that any juror could have observed—that he was
escorted by two men in suits from a side door in and
out of the courtroom—would be very unlikely to have
prejudiced the Defendant, given the Court's repeated
instructions regarding the presumption of innocence
and the jurors' duties to consider only the evidence.
Thus, this claim does not require a new trial.

United States v. Abdulwahab, No. 3:10CR248-02, 2011 WL 4434236,

at *4 (E.D. Va. Sept. 22, 2011), aff'd in part, rev'd in part on

other grounds by, 715 F.3d 521 (4th Cir. 2013).

Even assuming, arguendo, that counsel acted unreasonably in

not raising an objection at the time of the incident, Abdulwahab

has not demonstrated that counsel's failure to do so prejudiced

his defense.  As noted above, this Court already found that the

"limited amount of 'restraint' that any juror could have

observed . . . would be very unlikely to have prejudiced the

Defendant."  Id.  Abdulwahab provides no persuasive argument

that would convince the Court otherwise.[8]  Because Abdulwahab has

---

[8] Rather, Abdulwahab cites to cases in which the court found
prejudice because the defendants wore visible restraints during
court proceedings.  (§ 2255 Mot. 22-24 (citing Deck v. Missouri,
544 U.S. 622, 630 (2005) (holding that defendant improperly
required to wear shackles in front of jury during the penalty
phase of a capital proceeding); Roche v. Davis, 291 F.3d 473,
483-84 (7th Cir. 2002) (finding counsel ineffective for failing

failed to establish any deficiency or prejudice, Claim Four will be dismissed.

### IV. CONCLUSION

For the foregoing reasons, Abdulwahab's § 2255 Motion (ECF No. 490) will be denied.   The action will be dismissed.   A certificate of appealability will be denied.[9]

The Clerk is directed to send a copy of the Memorandum Opinion to counsel of record.

It is so ORDERED.

                                    /s/      REW
                              Robert E. Payne
                              Senior United States District Judge

Richmond, Virginia
Date: May 2, 2016

---

to object to defendant charged with murder being shackled in front of the jury); and United States v. Samuel, 431 F.2d 610, 614-15 (4th Cir. 1970) (noting that defendants are generally entitled to be free of restraints before the jury unless the need for greater security is established)).  Abdulwahab fails to demonstrate how these cases compel a finding of prejudice here.

[9] An appeal may not be taken from the final order in a § 2255 proceeding unless a judge issues a certificate of appealability ("COA").  28 U.S.C. § 2253(c)(1)(B).  A COA will not issue unless a prisoner makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2). This requirement is satisfied only when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" Slack v. McDaniel, 529 U.S. 473, 484 (2000) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)). Abdulwahab has not satisfied this standard.
23